[Cite as *In re B.E.S.*, 2014-Ohio-346.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: B.E.S., H.K.S., and B.L.S. | **:** | **O P I N I O N** |
| | **:** | |
| | **:** | **CASE NO. 2013-T-0098** |

Appeal from the Trumbull County Court of Common Pleas, Juvenile Division, Case No. 2006 JP 0728.

Judgment: Affirmed.

*Rhonda L. Granitto Santha,* 6401 State Route 534, Farmington, OH 44491 (For Appellant, Russell L. Swegan).

*Susan Porter Collins,* Trumbull County Children Services Board, 2282 Reeves Road, N.E., Warren, OH 44483 (For Appellee, Trumbull County Children Services Board).

*Terry A. Swauger,* 1129 Niles-Cortland Road, S.E., Warren, OH 44484 (Guardian ad litem for B.E.S. and B.L.S.).

*Emily Clark,* P.O. Box 1024, Warren, OH 44482 (Guardian ad litem for H.K.S.).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Russell Swegan, natural father of minor children B.E.S., H.K.S., and B.L.S., appeals from the judgment entry of the Trumbull County Court of Common Pleas, Juvenile Division, terminating his parental rights. We affirm.

{¶2} The children, B.E.S., born February 16, 2003; H.K.S., born February 8, 2004; and B.L.S., born January 6, 2006, lived with their parents, appellant and April Lucas, until appellant was sent to prison in September 2009. The children were

adjudicated dependent, neglected, or abused at various times in two counties before their case was transferred to the Trumbull County Children Service Board ("TCCSB").

{¶3} In July 2007, the Ashtabula County Juvenile Court found B.L.S. to be neglected, but did not remove him. When appellant was released from prison, in March 2010, he did not return to live with the children and their biological mother. In June 2010, the Ashtabula County Juvenile Court found each of the three children to be dependent and placed them into the care of their maternal aunt who resided in Summit County. The placement was effective July 2010.

{¶4} On August 25, 2010, the Summit County Juvenile Court issued emergency orders of temporary custody to the Summit County Children Service Board due to allegations that the children were acting out in a sexual manner. The record indicates the children had engaged, amongst each other and with their cousins, in inappropriate sexual activities. In November 2010, the Summit County Juvenile Court found all children dependent; the court further found that the children were exhibiting behavior consistent with sexual abuse; and further found H.K.S. abused. That court then placed the children into foster care and, because the parents had become residents of Trumbull County, referred the matter to the Trumbull County Juvenile Court.

{¶5} On January 28, 2011, the Trumbull County Juvenile Court accepted the transfer and the children were placed into the temporary custody of TCCSB. The children have remained in foster care since their removal from their aunt's custody, in August 2010. Given her particular emotional and behavioral problems, H.K.S. lives with a separate foster family from the foster family with which B.E.S. and B.L.S. reside.

{¶6} The temporary custody orders came before the court for two, six-month extensions. On July 6, 2011, the trial court granted the first six-month extension; the

2

court noted there were no compelling reasons for the TCCSB not to pursue permanent custody. And, on January 12, 2012, the trial court granted a second six-month extension. The court again noted that there were no compelling reasons for TCCSB not to pursue permanent custody. TCCSB subsequently requested the temporary orders be modified to Planned Permanent Living Arrangements ("PPLA") near the expiration of the second six-month period.

{¶7} On November 21, 2012, TCCSB filed a motion to terminate the natural parents' parental rights of the three children. The natural mother of the children, April Lucas, voluntarily surrendered her parental rights after the motion was filed. A hearing was held before the magistrate on December 6 and 7, 2012.

{¶8} At the hearing, testimony demonstrated appellant could neither read nor spell. He was unemployed and received approximately $720 per month in social security and disability income. He additionally received $200 in food stamps per month. He paid $550 per month in rent and other monthly expenses totaled $150.

{¶9} When the case was transferred to Trumbull County, TCCSB established a case plan for appellant that included completing a drug and alcohol assessment; a psychological assessment; and completing parenting classes. Appellant had a drug and alcohol assessment and attended counseling for marijuana. He was recommended to attend Alcoholics Anonymous, which he did, but eventually stopped. Appellant entered and completed a parenting program designated "Weathering the Storm." After his participation, however, his caseworker concluded he made minimal improvement in his ability to relate with and understand the children's special needs. Appellant was then referred to an intensive parenting program to assess his parenting skills. Becky

Crookston, a therapist for Northeast Ohio Behavioral Health, worked with appellant in the intensive parenting program.

{¶10} Ms. Crookston testified she met with appellant twice individually and once with the children present. At their first meeting, appellant was asked to fill out basic intake paperwork, with which he had great difficulty. Appellant was non-responsive to many questions Ms. Crookston asked and would frequently stare at her with a blank gaze. According to Ms. Crookston, appellant appeared confused throughout the session and she had concerns that he was not able to cognitively process the advice she was providing to assist him in parenting the children.

{¶11} Prior to the second meeting, Ms. Crookston spoke with the children's foster parents, who elaborated on each child's particular problems and needs. In general, each of the three children had specific, special needs due to the abuse and neglect they had suffered. They require constant, around-the-clock supervision. They act out sexually, particularly H.K.S., and engage in "tantruming," and defiant behavior. The record indicates they require custodians with special parenting skills to ensure they feel safe and secure. And, given their particular emotional and behavioral problems, the children require on-going counseling. Specifically, H.K.S. goes once a week with a specialized trauma therapist and has an in-home therapist once a week. H.K.S. also sees a physician twice a month for medication needs. B.E.S. also sees a counselor once a week and B.L.S. sees a counselor once a month. Both B.E.S. and B.L.S. visit a physician once a month for their relative medications.

{¶12} During her second session with appellant, Ms. Crookston focused upon the essentials of parenting, particularly providing for the children's basic as well as their special needs. Appellant stated that he had cameras he could use to monitor the

4

children when they are out of his immediate sight. When confronted about transporting the children for their therapy appointments, appellant, who has no driver's license, indicated, in a non-specific fashion, that he could call people for assistance. Ms. Crookston also inquired into how appellant expected to provide financially for the children. Appellant stated he would utilize government assistance because he would receive more food stamps if he had custody of the children.

{¶13} During the third session, Ms. Crookston met first with the children collectively. The children talked over one another and were anxious to communicate their past episodes of abuse and trauma-related events. The children expressed significant concerns for their security and safety. B.E.S., the eldest of the children, was ultimately able to calm his siblings so they could speak in turn. B.E.S. related a story to Ms. Crookston pertaining to appellant that caused each child distress. According to B.E.S., at some point before he went to prison, appellant installed a door with an outside lock on the entryway to the sibling's room. B.E.S. stated the door was regularly locked after the children went to bed and not unlocked until morning. Because of this, B.E.S. explained the children could not get out of the room to use the bathroom and, under emergency circumstances, had to relieve themselves on the floor. In the morning, B.E.S. claimed, the children had to clean the mess without appellant's assistance. The children expressed concern that, were they returned to appellant's custody, similar things would happen. Ms. Crookston recommended the children express their concerns to appellant and emphasize their need for appellant to provide a comfortable, secure, and safe home environment.

{¶14} When appellant was brought in with the children, they expressed their concerns and, according to Ms. Crookston, he merely stared at them. The children

5

explained they did not want their door locked at night. Appellant, however, became defensive and deflected their concerns, advising them their mother locked the door, not him.

{¶15} Although Ms. Crookston attempted to educate appellant on validating the children's needs and concerns, appellant appeared confused. And, throughout the remainder of the session, appellant appeared unable to appreciate the children's anxieties. He further evinced an inability to cognitively understand the severity of the trauma the children had experienced. Ms. Crookston ultimately decided further sessions with appellant would be unproductive. From her perspective, appellant required significant assistance to maintain his own basic needs. And, given her observations during the three sessions, Ms. Crookston did not feel appellant was capable of truly appreciating the children's emotional needs, let alone affording them the attention and support they require.

{¶16} According to appellant's TCCSB caseworker, Calliope Devengencie, appellant was following his case plan at the time the motion for permanent custody was filed. Moreover, appellant expressed interest in learning how to appropriately deal with them. Ms. Devengencie's main concern, however, was the lack of progress appellant had made in appreciating the severity of the children's behavioral and emotional issues and, by implication, his inability to understand what would be required of him, both pragmatically and emotionally, to meet their needs. She underscored that appellant's lack of stable transportation made it doubtful he could realistically get the children to their various counseling and medical appointments. Moreover, despite his genuine love for the children, Ms. Devengencie opined appellant's cognitive deficits and limited

6

means render him incapable of parenting children with the special needs these children exhibit.

{¶17} Appellant, while testifying on cross-examination, conceded he did not think he could handle custody of all three children. And, while he is aware his children have emotional and behavioral issues, he did not appreciate their extent or his role in assisting them in coping with their anxieties. Appellant finally acknowledged he might not be equipped, personally, to "handle" custody of his children in light of their special needs.

{¶18} Attorney Terry Swauger, the guardian ad litem ("GAL") for B.E.S. and B.L.S., recommended that permanent custody be granted to TCCSB. Atty. Swauger noted the children require significant attention, care, and need to attend their counseling appointments. He expressed doubts that appellant would be sufficiently committed to attending to the children's needs. Atty. Swauger underscored that appellant did not attend a pre-scheduled appointment for the GAL to observe him interacting with the children. Moreover, Atty. Swauger pointed out that appellant had been recently charged with a felony which, while only a charge and not a conviction, indicated to the GAL appellant had not made progress in changing his lifestyle since he was released from prison. According to the GAL, these points provided a strong basis for the conclusion that appellant is functionally unable to successfully care for B.E.S. and B.L.S., given their particular emotional and therapeutic needs. Finally, Mr. Swauger emphasized that the children are strongly bonded to their foster family and B.E.S. specifically requested that he and his sister be adopted because "we're safe there."

{¶19} Attorney Emily Clark was the GAL for H.K.S. Atty. Clark emphasized how the sexual abuse from which H.K.S. suffered rendered her extremely over sexualized

7

which, in the GAL's view, could create safety concerns when H.K.S. is around other children. H.K.S. indicated she would be distressed not to have her father and siblings in her life; her behavioral problems, however, make the latter impossible in the foreseeable future. Atty. Clark stated she attempted to meet with appellant twice, but he cancelled each appointment. The GAL, consequently, did not have an opportunity to interact with appellant. Atty. Clark opined that, in addition to her therapeutic needs, H.K.S. requires stability in her life. Given appellant's lifestyle and ostensible lack of commitment, however, the GAL did not believe appellant could provide H.K.S. with a stable home life. Atty. Clark therefore recommended that permanent custody of H.K.S. be granted to TCCSB.

{¶20} On January 31, 2013, the magistrate issued his decision granting permanent custody to TCCSB. The magistrate found the children had been in temporary custody of a public services agency for 22 consecutive months. The magistrate further found, that, despite reasonable efforts to address the problems causing their separation from appellant, they cannot be reunified. The court determined, given the children's specific needs and appellant's relative difficulty in appreciating these needs, that appellant was unsuitable or unfit to be given custody. Finally, after considering the best interest factors, the court concluded the children's best interests would be served by terminating appellant's parental rights and granting TCCSB permanent custody. The trial court subsequently overruled appellant's objections and, on August 29, 2013, entered judgment adopting the magistrate's decision.

{¶21} Appellant now appeals and assigns two errors for this court's review.

8

{¶22} A parent has a basic civil right to raise his or her child. *See e.g. In re M.J.*, 11th Dist. Ashtabula No. 2011-A-0007, 2011-Ohio-2714, ¶16. This right, however, is not absolute. A parent's right to raise his or her child is subordinate to the child's best interest. *Miller v. Mille*r, 37 Ohio St.3d 71, 75 (1988). Indeed, "a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C).

{¶23} With this in mind, R.C. 2151.414 provides the two-prong analysis a court must follow in permanent custody proceedings. Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency and that any of the following apply:

{¶24} (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶25} (b) The child is abandoned.

9

{¶26} (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

{¶27} (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶28} Appellant does not dispute the applicability of subsection (d) in this case and the record reflects that the children have been in the temporary custody of TCCSB for at least 12 months of a consecutive 22-month period.

{¶29} After concluding one of the four factors in R.C. 2151.414(B)(1)(a)-(d) applies, the trial court must decide, by clear and convincing evidence, whether the award of permanent custody to an agency is in the child's best interest based upon a non-exclusive list of relevant factors which are set forth in R.C. 2151.414(D):

{¶30} (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

10

**{¶31}** (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**{¶32}** (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

**{¶33}** (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

**{¶34}** (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶35}** "Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Aiken*, 11th Dist. Lake No. 2005-L-094, 2005-Ohio-6146, ¶28. Upon appellate review of cases involving the termination of parental rights, the civil manifest weight of the evidence standard is applied: "if the trial court's grant of permanent custody to the county is supported by

11

some competent, credible evidence, we must affirm the court's decision." *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶91. Finally, an appellate court reviews a trial court's adoption of a magistrate's decision for an abuse of discretion. *In re Simkins*, 11th Dist. Trumbull No. 2002-T-0173, 2003-Ohio-1884, ¶10. With the foregoing standards in mind, we shall proceed to address appellant's challenges.

{¶36} Appellant's first assignment of error provides:

{¶37} "The trial court abused its discretion by giving all the weight of evidence to a therapist's one-time, short interaction between Appellant and his children to conclude, pursuant to R.C. 2151.414(D), that Permanent Custody is in the best interest of these children."

{¶38} Appellant contends the magistrate erred in giving too much weight to the testimony of intensive-parenting-program therapist Becky Crookston. Moreover, appellant contends the magistrate's findings and conclusions are inconsistent with the evidence presented at the hearing. We do not agree.

{¶39} In his decision, after entering the "12 in 22" finding, the magistrate proceeded to make findings pursuant to R.C. 2151.414(E)(1). R.C. 2151.414(E)(1) provides, in relevant part:

{¶40} (E) In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or * * * that one or more of the following exist as to each of the child's parents, the court shall

12

enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶41} (1)  Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶42}  The magistrate acknowledged that it was unnecessary to make findings pursuant to subsection (E) and the only remaining issue was whether termination of appellant's rights would be in the children's best interest; the magistrate nevertheless considered the foregoing provision "because it illuminates why the children cannot be returned to Father today."

{¶43}  To support his conclusion that, despite reasonable efforts to address the problems causing the removal, the children cannot be returned to appellant, the magistrate underscored the children's severe emotional and behavioral issues.  In particular, the court observed that H.K.S., who was seven years old at the time of the hearing, is the most damaged in terms of sexually acting out and inappropriately

13

touching others. The child requires two-on-one supervision at all times, and cannot, by virtue of her behavior, be placed in the same home with her siblings. And, while B.E.S. and B.L.S. can be in the same home, B.E.S. cannot have physical contact with others because he becomes overly stimulated. The magistrate further found that, given the cognitive deficiencies appellant exhibits as well as his inability to help the children cope with their anxieties, he is unable to parent the children "in the state they are found."

{¶44} The magistrate's findings and conclusions find support in the specific testimony of Ms. Crookston and her experiences treating appellant over the course of three separate sessions. They also are supported by the testimony of appellant's case worker, the GAL testimony and reports, and even appellant's own testimony. Accordingly, even though the magistrate relied on various details about appellant's inability to effectively parent the children taken from Ms. Crookston's testimony, this does not render the findings against the weight of the evidence. To the contrary, the manifest weight of the evidence was consistent *with* Ms. Crookston's testimony.

{¶45} Prior to being sent to the intensive parenting program administered by Ms. Crookston, appellant completed the "Weathering the Storm" parenting course. From the commencement through its completion, however, appellant made only "minimal improvements" in his parenting ability. Further, although appellant only had three sessions with Ms. Crookston, these interactions were sufficient for her to formulate an opinion that appellant needed more than intensive parent–child interaction therapy. In her view, appellant's cognitive deficits and lack of any significant support system indicated he would need more extensive assistance to maintain his own basic needs, let alone the needs, both practical and emotional, of the three children.

14

{¶46} Ms. Crookston underscored appellant's inability to validate the children's emotions and properly interact with them. Appellant's deficiencies in this area, however, were only part of her justification for terminating therapy. The overall tenor of her testimony and letter to TCCSB demonstrate that Ms. Crookston, in her professional estimation, believed, no matter how many sessions she had, appellant would not likely improve; and, even if he made some strides in his parenting skills, he would not have the means to realistically provide the children with the attention and stability necessary for their upbringing. The record is simply devoid of any evidence that appellant was making meaningful progress in his ability to parent the subject children. And, at the termination hearing, appellant expressly acknowledged these points. When questioned about whether he would have the requisite abilities to care for the children in light of their special needs, he responded in the negative. The weight of the evidence is consistent with Ms. Crookston's testimony and the magistrate did not err in relying on the evidence to which she attested in arriving at its decision.

{¶47} Appellant asserts, however, the record demonstrates he was progressing in his case plan and, as a result, takes issue with the trial court's conclusion that he was unable to complete his case plan and would be unable to do so within a reasonable time despite TCSSB's reasonable efforts to assist him. We do not agree.

{¶48} Appellant's caseworker, Calliope Devengencie, provided testimony on how TCCSB assisted appellant in meeting his case plan goals. Ms. Devengencie acknowledged that appellant had made an effort to meet his case plan goals. He completed a drug and alcohol screen, completed anger management, and completed a psychological assessment. Pursuant to the psychological assessment, however, appellant had a poor understanding of child development and lacked empathy for

15

children. Given these problems, Ms. Devengencie stated TCCSB enrolled him in the "Weathering the Storm" parenting class and later paid for his visits with Ms. Crookston. The record reflects, however, appellant made little to no real progress in his ability to appreciate or relate with the children. And, concerned about his ability to meet his own basic needs, TCCSB, per Ms. Crookston's recommendation, suggested appellant contact Trumbull County Developmental Disabilities Board for further assistance. Ms. Devengencie testified that she would have helped appellant with this had he expressed an interest; he, however, did not follow up with the suggestion.

{¶49} Although appellant was adhering to his case plan, the record does not indicate he was making progress in the areas TCCSB found most crucial; namely, his ability to appreciate and validate the emotional and therapeutic needs of the children, as well as his ability to practically understand the resources it would take to effectively care for the children. In fact, from the inception of TCCSB's involvement in the case, appellant's skills in these areas seemed to remain in stasis. This is not, however, a function of TCCSB's lassitude. To the contrary, TCCSB made reasonable efforts to assist appellant in improving his parenting skills and abilities to connect effectively with the children. To wit, TCCSB recommended, sought out, and paid for parenting classes and intensive parental interaction classes. Although the intensive parental interaction therapy was terminated after three sessions, it was ended at the recommendation of appellant's therapist. And the evidence submitted at the hearing indicates this decision was based upon Ms. Crookston's professional opinion that appellant was not making progress in a way that would suggest the therapy sessions would be of any benefit even if they continued.

16

{¶50} Moreover, even when the foregoing programs did not work out, TCCSB urged appellant to contact the Trumbull County Developmental Disabilities Board for further assistance. Something appellant's caseworker testified she was willing to assist him with if he decided to pursue it. Ultimately, however, he apparently passed on this option. Viewed as a whole, the evidence demonstrates TCCSB made reasonable efforts to assist appellant in reunifying with his children; in the end, however, the magistrate concluded this possibility could not happen in a reasonable time. We hold this conclusion is consistent with the weight of the evidence.

{¶51} Overall, the record demonstrates appellant, given his intellectual and emotional limitations, was unable to make sufficient progress during the course of the case that would realistically indicate the children, each with their own personal emotional and behavioral issues, could be returned to him within a reasonable time. TCCSB provided appellant with reasonable opportunities to understand proper parenting skills and enhance his parental abilities but, as of the date of the hearing, appellant had shown, at best, minimal improvement. Moreover, the evidence demonstrated that appellant does not have a job, is living on government assistance, and does not have a driver's license or a specific identified means of consistent transportation. In light of the surrounding circumstances, appellant even testified he knew he may not be equipped to care for the children, given their special needs. With these facts in mind, we hold the magistrate did not err in concluding that, despite reasonable efforts to address the issues keeping appellant and the children from being reunified, reunification is not a viable option. We therefore hold the trial court did not abuse its discretion in adopting the magistrate's decision in this regard.

{¶52} Appellant's first assignment of error is without merit.

17

{¶53} Appellant's second assignment of error states:

{¶54} "The trial court ignored the best interest mandate of R.C. 2151.414(D)(1) subsection (d) requiring a determination that a legally secure placement can/cannot be achieved without the grant of Permanent Custody; the same court ordered PPLA 6 months earlier, same facts, in the children's best interests."

{¶55} Under this assignment of error, appellant appears to assert the circumstances that lead to the children being placed into a PPLA approximately six months prior to the entry of judgment terminating appellant's parental rights were essentially the same as those leading to the court's decision to terminate appellant's parental rights. According to appellant, however, the children are still in custodial "limbo." Thus, in appellant's view, "the only thing this permanent custody ruling did was sever these children's biological identity." We do not agree.

{¶56} Preliminarily, the permanent custody judgment did nothing to affect the children's biological identity; rather, it functioned to terminate appellant's rights as a caregiver to the children. The judgment was neither premised upon appellant's deviation or disregard of his case plan nor was it based upon appellant's lack of interest in the children. Rather, it was premised upon appellant's inability to provide proper and stable care for children with specialized needs; i.e., it was based upon the children's best interests. That the circumstances had not changed since the children were placed into the PPLA, arguably provides a stronger foundation for the trial court's judgment regarding the children's need for a legally secure, permanent placement.

{¶57} A PPLA is "an order of a juvenile court pursuant to which both of the following apply: (a) The court gives legal custody of a child to a public children services agency * * * without the termination of parental rights[;] (b) The order permits the agency

18

to make an appropriate placement of the child and to enter into a written agreement with a foster care provider or with another person or agency with whom the child is placed." R.C. 2151.011(B)(39). "Temporary Custody" is defined as the "legal custody of a child who is removed from the child's home, which custody may be terminated at any time at the discretion of the court * * *." R.C. 2151.011(B)(52). Whether a child is in a PPLA or in an agency's temporary custody, the supervising authority for the child is an agency. In effect, neither custodial status, whether a PPLA or temporary custody, prohibits an agency from seeking permanent custody of a child under R.C. 2151.413. *In re J.I.*, 12th Dist. Preble No. CA2005-05-008, 2005-Ohio-4920, ¶15.

{¶58} The record demonstrates the children require a safe and stable home life; one in which they are able to address their emotional and behavioral problems, through consistent supervision and therapeutic interaction. The magistrate concluded that the children could not be reunified with appellant within a reasonable time, despite reasonable efforts, because appellant was unfit. This finding was premised upon appellant's cognitive deficits, his inability to effectively relate with the children, and practical considerations, such as the likelihood that he would be unable to provide for the children's basic needs, which include an intensive counseling and therapeutic regimen. We held under appellant's first assignment of error that this conclusion was consistent with the weight of the evidence. Further, the children were in the temporary custody of a state agency for three years from the inception of the case through the final order of termination. A significant period of time when, as here, the children require a stable, permanent living arrangement. Viewing these points together, we hold that the magistrate's decision that granting permanent custody to TCCSB is not against the

19

weight of the evidence.  By implication, we therefore conclude that the trial court did not abuse its discretion in adopting the magistrate's decision.

**{¶59}** Appellant's second assignment of error is without merit.

**{¶60}** For the reasons discussed in this opinion, the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.


TIMOTHY P. CANNON, P.J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____


COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.


**{¶61}** Finding merit in the second assignment of error, I would reverse and remand.

**{¶62}** "[T]he termination of parental rights is '(* * *) the family law equivalent of the death penalty (* * *).' *In re Phillips*, 11th Dist. No. 2005-A-0020, 2005-Ohio-3774, at ¶22, citing *In re Hoffman,* 97 Ohio St.3d 92, 2002-Ohio-5368, at ¶14, * * *.  See, also, *In re Murray* (1990), 52 Ohio St.3d 155, 157, * * * (parents have a 'fundamental liberty interest' in the care, custody, and management of their children, and an 'essential' and 'basic civil right' to raise them).  Accordingly, when the state initiates a permanent custody proceeding, parents must be provided with fundamentally fair procedures in accordance with the due process provisions of the Fourteenth Amendment to the United States Constitution, and Section 16, Article I of the Ohio Constitution.  *In re Sheffey,* 167 Ohio App.3d 141, 2006-Ohio-619, at ¶21, * * *.  This includes effective assistance of counsel.  *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, * * *, paragraph two of the

syllabus; *In re Ridenour,* 11th Dist. Nos. 2004-L-168, and 2004-L-169, and 2004-L-170, 2005-Ohio-349, at ¶9; *In re Brewster* (Mar. 25, 1994), 11th Dist. No. 91-P-2365, 1994 Ohio App. LEXIS 1317, at 3, citing *Jones v. Lucas Cty. Children Services Bd.* (1988), 46 Ohio App.3d 85, 86, * * *." (Parallel citations omitted.) *In re Roque*, 11th Dist. Trumbull No. 2005-T-0138, 2006-Ohio-7007, ¶7.

{¶63} The test for effective assistance of counsel in termination of parental rights proceedings is the same as in criminal proceedings. *In re C.R., V.R.*, 6th Dist. Lucas No. L-13-1110, 2013-Ohio-5069, ¶21, citing *In re Heston*, 129 Ohio App.3d 825, 827 (1st Dist.1998). "Therefore, in order to prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from such performance. *State v. Reynolds,* 80 Ohio St.3d 670, 674, * * * (1998), citing *Strickland v. Washington,* 466 U.S. 668, * * * (1984)." *Id.*

{¶64} In this case, in camera interviews with the three children were initially conducted by the trial court's magistrate December 26, 2012. B.E.S. indicated he no longer wished to see appellant. H.K.S. and B.L.S. strongly expressed their desire to continue a relationship with him. At this time, all three children had one guardian ad litem. At hearing, this guardian ad litem did *not* testify regarding the wishes of H.K.S. and B.L.S., though their desire to continue seeing appellant conflicted with his best interest analysis, which was in favor of terminating appellant's parental rights.

{¶65} Thereafter, two new guardians ad litem were appointed for the children – one for B.E.S. and B.L.S., and one for H.K.S. July 25, 2013, the trial court itself conducted an in camera interview of the first two children. B.E.S. continued to express no particular interest in seeing appellant; B.L.S. remained adamant she did wish to

21

continue their relationship. The new guardian ad litem for these children failed to testify regarding their wishes at hearing, even though he advocated terminating appellant's parental rights, contrary to the wishes of B.L.S.

{¶66} July 29, 2013, the trial court conducted a second in camera interview with H.K.S., in the presence of her new guardian. H.K.S. continued to express a strong desire to see appellant. At hearing, the new guardian ad litem did testify regarding the wishes of H.K.S., even though it conflicted with her best interest analysis, which, again, supported termination of appellant's parental rights.

{¶67} At oral argument before this court, it was revealed that appellant's counsel had *never* read the in camera interviews prior to hearing in the trial court.

{¶68} I respectfully believe that failure by counsel for a parent to familiarize himself or herself with the contents of in camera interviews of children in a termination of parental rights case meets the first prong of the *Strickland* test: it falls below an objective standard of reasonableness. Further, I would hold that such a failure meets the second prong of the *Strickland* test as a matter of law: it is necessarily prejudicial, since it means counsel for the parent whose fundamental rights are at risk is not properly prepared to present to the trial court the wishes of the child, a vital part of the best interest analysis in these cases. R.C. 2151.414(D)(1)(b).

{¶69} Further, I believe the rights of H.K.S. and B.L.S. were violated in this case, through failure to appoint them separate counsel. The Supreme Court of Ohio has held that R.C. 2151.352, and Juv.R. 4(A) and 2(Y) mandate appointment of counsel for children under certain circumstances in termination of parental rights cases, since they are parties to the case. *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus. Sup.R. 48(D)(8) requires that guardians ad litem request appointment of counsel for

22

children when the guardian knows his or her interpretation of a child's best interest conflicts with that of the child. In this case, the guardians knew their interpretation of best interest conflicted with those of H.K.S. and B.L.S., as did the trial court. Ohio case law establishes that in such situations, the trial court *should* appoint separate counsel. *See, e.g., Walton v. Walton*, 6th Dist. Wood No. WD-06-066, 2007-Ohio-4325, ¶59 (interpreting Civ.R. 75(B)(2)).

{¶70} I would also find the failure to appoint counsel for H.K.S. and B.L.S. violated their constitutional rights to due process.

{¶71} "The Fourteenth Amendment to the United States Constitution provides that state governments may not 'deprive any person of life, liberty, or property, without due process of law.' The Ohio Constitution guarantees 'due course of law,' which is virtually the same as the Due Process Clause of the Fourteenth Amendment. *In re Hua* (1980), 62 Ohio St. 2d 227, * * *; see Section 16, Article I of the Ohio Constitution. '(Procedural) (d)ue process of law involves the essential rights of notice, hearing and the opportunity to be heard before a competent tribunal.' *Bakaitis v. Bakaitis* (May 23, 1983), Montgomery App. No. 7997, 1983 Ohio App. LEXIS 12648, citing *State v. Edwards* (1952), 157 Ohio St. 175, * * *, cert. denied 343 U.S. 936, * * *. Essentially, '(a)mple opportunity must be afforded the parties in appropriate cases to defend, enforce or protect their rights through presentation of their own evidence, confrontation and cross-examination of adverse witnesses, and oral argument.' *Bakaitis v. Bakaitis* (May 23, 1983), Montgomery App. No. 7997, 1983 Ohio App. LEXIS 12648, citing [*State ex rel. Wright v.*] *Morrison*, [80 Ohio App. 135 (1947)]; *Goldberg v. Kelly* (1970), 397 U.S.

254, * * *." (Parallel citations omitted.) *Price v. Nixon*, 2d Dist. Clark No. 2010-CA-058, 2011-Ohio-2430, ¶31.

{¶72} "Juv.R. 1(B) provides that the Juvenile Rules 'shall be liberally interpreted and construed so as to effectuate (* * *) the just determination of every juvenile court proceeding by ensuring the parties a fair hearing and the recognition and enforcement of their constitutional and other legal rights.' Once we accept the premise that the subject child is a party whose due process rights are entitled to protection, peripheral practical considerations fade in importance." *Williams*, *supra*, ¶28.

{¶73} Neither the Fourteenth Amendment to the U.S. Constitution, nor Article I, Section 16 of the Ohio Constitution differentiates between the due process rights of persons above, or below, the age of majority. A termination of parental rights proceedings necessarily involves some of the most precious rights of minors, and is a process to which the full protections of due process should apply. I respectfully believe it was incumbent on the trial court to appoint counsel for H.K.S. and B.L.S. to protect their due process rights in this case, given their consistently expressed wishes to maintain contact with their father.

{¶74} I respectfully dissent.