[Cite as *In re M.S.*, 2014-Ohio-3184.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: M.S. (2), ABUSED/DEPENDENT CHILD | : | **O P I N I O N** |
| | : | |
| | | **CASE NO.  2014-L-036** |
| | : | |

Civil Appeal from the Lake County Court of Common Pleas, Juvenile Division, Case No. 2011 AB 00872.

Judgment: Affirmed.

*Mary E. Santez,* Mary Santez, Esq., LLC, 1497 East 361st Street, Suite #3, Eastlake, OH 44095 (For Appellant-Satrena Swank).

*Charles E. Coulson,* Lake County Prosecutor, and *Teri R. Daniel,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Appellee-Lake County Department of Job and Family Services).

*Richard P. Morrison,* 30601 Euclid Avenue, Wickliffe, OH 44092 (Guardian ad Litem).

DIANE V. GRENDELL, J.

{¶1}  Appellant, Satrena Swank, appeals the Judgment of the Lake County Court of Common Pleas, Juvenile Division, granting appellee, Lake County Department of Job and Family Services', Motion for Permanent Custody.  The issues before this court are whether a therapist's testimony regarding visitation issues between a mother and child violates the therapist's ethical duties and renders the testimony inadmissible, and whether a mother's substantial compliance with the case plan is determinative of

whether a grant of permanent custody is in the child's best interests. For the following reasons, we affirm the decision of the court below.

{¶2} On June 7, 2011, the Lake County Department of Job and Family Services filed a Complaint, alleging the abuse and dependency of the minor child, M.S.(2), then age nine (dob 07/11/2001), and seeking an order of protective supervision. The Complaint further alleged that the child resided with her mother, Satrena Swank, at 68 Lincoln Boulevard, Painesville, Ohio, and that her father, Matthew Swank, was currently incarcerated at the Lake County Jail.

{¶3} On June 10, 2011, the juvenile court appointed Richard Morrison as Guardian ad Litem for the minor child.

{¶4} On July 15, 2011, Morrison filed a Motion for Emergency Temporary Custody. On the same day, the juvenile court granted Morrison's Motion and awarded Job and Family Services emergency temporary custody of the minor child.

{¶5} On July 18, 2011, by Magistrate Order and with the agreement of all parties, the minor child was placed in the temporary custody of Carrie and Demetreous Dautartas (maternal aunt and uncle).

{¶6} On August 9, 2011, a hearing was held on the Complaint. Swank failed to appear although she was duly served and notified. The juvenile court determined that the minor child was abused, pursuant to R.C. 2151.031(B) (the child is endangered) and 2151.031(C) (child exhibits evidence of non-accidental physical or mental injury), and dependent, pursuant to R.C. 2151.04(C) (the child's "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship"), based on the following underlying evidence:

2

[O]n March 18, 2011, the Lake County Department of Job and Family Services also referred to as the Department received information that mother, Satrena Swank, had struck M.S.(2). It was also reported that Mother and her boyfriend abuse and sell drugs from their residence. On that date, a social worker from the Department responded to the Swank home along with an officer from the Painesville Police Department to investigate these claims. In speaking with Mother, she indicated that a few days prior she had caught M.S.(2) and M.S.(3) [M.S.(2)'s younger sister] playing with matches. Mother stated that she disciplined both M.S.(2) and M.S.(3) by striking them with a belt. The social worker noted multiple bruises on both M.S.(2) and M.S.(3)'s person, including on the buttocks, arms, thighs and foreheads. Mother explained that the children received the bruising on different parts of their bodies because they were squirming while she tried to discipline them. Mother did think that she may have hit the children too hard, but felt playing with matches was serious and the children needed to be punished accordingly. Mother also informed the social worker that M.S.(2) has cerebral palsy which causes her to bruise more easily. The social worker did not notice any bruises on M.S.(1) [M.S.(2)'s older brother].

At a subsequent home visit, Ms. Swank denied that illegal drugs were sold or abused in the home. She did report that she has back

problems for which she takes prescription medication. Mother said that she ran out of her medication shortly before she found M.S.(2) and M.S.(3) playing with matches. Mother said she was in a lot of pain, which may have contributed to disciplining the children too roughly.

The court granted Job and Family Services protective supervision of the minor child and ordered the child to continue in the temporary custody of Carrie and Demetreous Dautartas.

{¶7} On December 2, 2011, Job and Family Services filed a Motion to Request a 72 Hour Hearing. Job and Family Services stated that, on December 1, 2011, Dautartas advised that "she would no longer be able or willing to care for the children in her home," based on "concerns that the children were performing sexual acts on each other."

{¶8} On the same day, the juvenile court granted Job and Family Services temporary custody of the minor child. The child was placed in a certified foster home.

{¶9} On November 14, 2012, Job and Family Services filed a Motion to Extend Temporary Custody. The Motion reported that Swank "successfully completed a parenting program through the Ohio State Extension Office," "continues to make much progress in her interactions with the children during visits," and "has shown much improvement in following the recommendations of the children's counselors." The minor child was diagnosed and treated for ADHD. It was learned that the sexual activity between the minor child and her siblings, particularly her older brother, "was much more extensive than previously reported." Accordingly, the minor child was "in need of more

4

mental health services." Swank admitted to marijuana use and began attending AA meetings regularly. Swank had "not secured adequate housing to ensure the safety of the children."

{¶10} On January 8, 2013, the juvenile court extended Job and Family Services' temporary custody of the minor child.

{¶11} On June 4, 2013, Job and Family Services filed a Motion to Extend Temporary Custody. The Motion reported that visitation between Swank and the minor child was suspended, as of April 10, 2013, on the recommendation of the child's counselor, Carol Fox.

> During mother's visits with the girls, Mother continued to demonstrate a lot of agitation in her interactions with the children. Mother struggled with basic parenting skills, such as enforcing time-outs. For approximately two (2) weeks in early February 2013, Mother did not take her psychotropic medications. During that period, the Department social worker had to interrupt a supervised visit between Mother and her daughters due to Mother being excessively rough in her interactions with the girls.

Job and Family Services was exploring the possibility of placing the minor child with another maternal aunt, Danyell Dautartas, recently relocated to Lake County.

{¶12} On September 10, 2013, the juvenile court extended Job and Family Services' temporary custody of the minor child.

{¶13} On November 27, 2013, Job and Family Services filed a Motion for Permanent Custody.

{¶14} On February 18, 2014, Morrison filed the Guardian ad Litem Report and Recommendation, advising that it is in the minor child's best interests that Job and Family Services' Motion for Permanent Custody be granted.

{¶15} On February 26, 2014, a hearing was held on the Motion for Permanent Custody. At the hearing, the following witnesses testified on behalf of Jobs and Family Services:

{¶16} Megan Mehicic testified that, in the Spring of 2011, she was a social worker with Job and Family Services ongoing division, assigned to work with the Swank family. In July 2011, Swank and her three children were residing with two other adult women in a rental property on Lincoln Boulevard in Painesville. The women were being evicted because they could not pay rent, purportedly because the rent money had been wired to a pastor doing missionary work in Africa. As a result, the children were placed in the custody of the maternal aunt and uncle, the Dautartases. In December 2011, the children had to be removed from the Dautartas household when it was discovered that they were molesting each other. Job and Family Services took custody of the minor child (M.S.(2)) and placed her in a foster home, where she has been doing "okay." The foster family has addressed her special needs, in addition to arranging for tutoring, swimming lessons, and church activities. The minor child's special needs include cerebral palsy, ADHD, and closer supervision due to her sexual history.

{¶17} Mehicic testified that the father, Matthew Swank, has been incarcerated for the duration of these proceedings, except for a period in November 2012. At this time, Mr. Swank had a single supervised visit with the minor child. Mr. Swank is

expected to be released in December 2015. A maternal aunt, Danyell Dautartas, was considered for custody but declined after learning about the minor child's special needs.

{¶18} Mehicic testified that Job and Family Services has not considered a permanent planned living arrangement (PPLA) for the minor child, since she is adoptable and they hope for her to have the permanency of a "forever home."

{¶19} Mehicic testified that Swank has "multiple mental health diagnoses, as well as some substance abuse issues." Mehicic has witnessed Swank "have some really good interactions with her daughters * * * when she's been clean and sober for a while and also taking her prescribed psychiatric medications." There have also been instances where Mehicic has had to intervene during visitations where Swank "was being very rough with the girls." Swank has also had several relapses with respect to her substance abuse issues. Her last relapse was about a year before the permanent custody hearing.

{¶20} Mehicic testified that visitation between Swank and the minor child was discontinued in April 2013, on the recommendation of the child's counselor, Carol Fox. Swank eventually met with Fox to address the situation, but it took several months for Swank to complete the necessary paperwork.

{¶21} Mehicic testified that Swank currently has housing with the Shelter Plus Care Program under a single person voucher.

{¶22} Mehicic testified that the minor child has no contact with her older brother and limited contact with her younger sister and the Dautartases' children (her cousins).

{¶23} Michelle Edwards, currently employed by Job and Family Services, testified that she became the Swanks' ongoing social worker in January 2014. Prior to

the hearing, she conducted two home visits with Swank. Toward the end of the first visit, Swank informed Edwards that her fiancé had been in the bathroom throughout the visit (approximately 30 to 45 minutes). He was identified as Robert Goff. In 2002, Goff was convicted of unlawful sexual contact with a minor and designated a sexually-oriented offender. Goff was currently registered with the sheriff's department at Swank's address. Swank told Edwards that she knew Goff was a sex offender, but was unsure of his specific offense.

{¶24} Edwards testified that the minor child is "doing well" in foster care and has average grades. The child's foster family is following her counselors' recommendations, including the "safety contract" when the child is around other children.

{¶25} Edwards testified that Swank is attending counseling and maintaining her sobriety. In particular Swank is becoming a leader at AA meetings.

{¶26} Tracey Filipasic, a dual diagnosis therapist at Beacon Health, testified that Swank has been her client since October 2012. She is diagnosed with bipolar disorder, post-traumatic stress disorder, opiate dependence, and cocaine abuse. Swank attends about 80 percent of her counseling sessions. Originally, her attendance was sporadic but she currently attends regularly and gives notice in advance when she is not able to attend. She participates actively in sessions and has become more open in addressing her issues/trauma. According to Swank, her last relapse was in January 2013.

{¶27} Carol Fox, a clinical therapist at Signature Health, testified that the minor child has been her client for about a year and a half [since August 2012]. With respect to the sexual abuse history, the child was both victim and perpetrator. The child must be kept under "line of sight" supervision.

8

**{¶28}** Fox also performed a parenting assessment on Swank for a period of six sessions. Fox opined that Swank has the ability to parent, "if she were to remain clean, * * * not using any kind of drugs, not associating with anyone that was drug related, offending related."

**{¶29}** In April 2013, Fox recommended that Swank's visitation with the minor child cease because it was "becoming very disruptive to [the minor child's] treatment." The child would be "upset" after visiting with her mother: "she couldn't settle down * * *, she was angry, she questioned everything that was happening at the visits. * * * [W]e had reached the point where we weren't able to do any of the treatment that she needed." Fox explained:

> Her mother is a trigger and will always be a trigger for her. Her ability to move on with her life for her to complete treatment is dependent upon learning how to deal with that and right now her fears still come up at every session, that she feels she has – her mother cannot protect her and she voices this frequently. * * * [The child] is going to remain in treatment for a long time. If she can focus solely on treatment, she should be able to maintain eventually a relatively normal life.

**{¶30}** Since suspending visitation, the minor child has become "calmer," "more willing to focus on what [she] needed to work on," and "there have been fewer crying sessions."

**{¶31}** Fox testified that the minor child would benefit from being in a permanent home. She is aware that her younger sister has found a permanent placement and

wants the same thing. The child's agitation was aggravated by Swank's representations that she would be "coming home" soon.

{¶32} Swank testified on her own behalf. She has had several residences since Job and Family Services began their involvement. For the past couple of months, she has resided at 716 High Street, Fairport, Ohio. She was asking the court for "some type of visitation * * * because right now I do not have housing for her." Swank believed it was in the child's best interests to have visitation because "a daughter needs her mother and her mother's healthy now, so something should be worked out."

{¶33} Swank testified that she has not used drugs since January 2013. She has been involved with various groups that help develop her coping skills, such as an opiates foundation class, a women's group, and reaching for recovery.

{¶34} Swank testified that Job and Family Services became involved when a roommate reported that she was "whooping [her] child." As a result of that, Swank was convicted of two counts of endangering children. In 2012, Swank was convicted of theft involving the misuse of credit cards.

{¶35} Swank testified that a roommate ("a friend of a friend"), Roger Gullion[1], sexually abused her children while she was "getting high."

{¶36} Swank testified that she had broken off her relationship with Robert Goff and had not seen him since the Friday before the permanent custody hearing. In addition to unlawful sexual contact with a minor, Goff was convicted of domestic violence in 2012. She broke off the relationship because of "rumors that he was seeing some other person," "he has a domestic," and "his charges of being a sex offender."

---

1. Gullion is currently serving a twenty-year prison term for rape. *See State v. Gullion*, 11th Dist. Lake No. 2012-L-114, 2013-Ohio-147.

10

{¶37} Kathleen Kribel testified on behalf of Swank. She has known Swank for about two years. Kribel has been taking her to AA meetings twice a week for about a year. Over the course of their relationship, Kribel noticed that Swank became happier and more confident. Kribel believed that Swank would act in her children's best interests.

{¶38} Liam O'Brien-Bours, a dual diagnosis case manager at Beacon Health, testified that he became Swank's case manager in August 2013. O'Brien-Bours testified that Swank is "doing well" and "showing improvements." In particular, she needs less direct supervision and demonstrates more initiative on her own.

{¶39} Danielle Kehr testified that she came to know Swank while interning and working as an employment specialist at Beacon Health. Kehr testified that Swank has made "huge improvements" and is compliant with recommendations.

> In regards to her motivation, in coming to appointments in general. She was much better at handling her coping skills, addressing her feelings, and she just seemed more conformable and more motivated in getting help in regards to her mental health, as well as addiction.

{¶40} Richard Morrison testified as the minor child's guardian ad litem. Regarding her custody, Morrison spoke with the minor child but did not feel it appropriate to ask her directly what her preference was. The child did advise "that she didn't mind not returning to her mother and being adopted by another family," and, although she "will be sad not to live with her mother," she "knows that she will be able to see her mother again once she turns eighteen if she so chooses."

11

{¶41} Morrison noted that it was "most telling" and "very important" that the minor child recently reported having "had a happy day." Morrison believed that an award of permanent custody to Job and Family Services was in the child's best interests.

{¶42} On February 27, 2014, the juvenile court issued a Judgment Entry, granting Job and Family Services' Motion for Permanent Custody.

{¶43} On March 28, 2014, Swank filed her Notice of Appeal. On appeal, she raises the following assignments of error:

{¶44} "[1.] In its grant of permanent custody to the Lake County Department of Job and Family Services pursuant to O.R.C. 2151.413 et seq., the trial court erred in considering the recommendation of M.S.(2)'s therapist/counselor that all contact between Mother-Appellant, Satrena Swank, and M.S.(2) should be indefinitely suspended."

{¶45} "[2.] The trial court's decision to grant permanent custody to the Lake County Department of Job and Family Services was against the manifest weight of the evidence, an abuse of discretion, contrary to law, was not supported by sufficient clear and convincing evidence, and was contrary to the best interest of M.S.(2), because an alternate permanency plan whereby M.S.(2) and Mother-Appellant would have been able to maintain a parent-child relationship without completely severing Mother-Appellant's rights was possible and would have better served M.S.(2)'s best interests."

{¶46} Upon the motion of a public children services agency requesting permanent custody of a child pursuant to R.C. 2151.413, the juvenile court may grant the motion "if the court determines at the hearing held pursuant to [R.C. 2151.414(A)],

by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and * * * [t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d); *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 8-22.

**{¶47}** The Ohio Supreme Court "has defined clear and convincing evidence as 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶48}** "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477. Sufficiency of the evidence is "a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

**{¶49}** In general, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court

13

as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. Stated otherwise, "evidence must * * * exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

{¶50} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990); *Eastley* at ¶ 17-23 (explaining and affirming the applicability of *Thompkins* in civil cases).

{¶51} In the first assignment of error, Swank argues that the juvenile court improperly considered Carol Fox' testimony, recommending the suspension of visitation between Swank and the minor child, on the grounds that such testimony was ethically improper.

{¶52} Swank relies on the following from Chapter 4757 of the Ohio Administrative Code, applicable to counselors, social workers, and marriage and family therapists:

> A counselor, social worker, or marriage and family therapist shall
>
> not conduct a court evaluation in a case in which that counselor,

social worker, or marriage and family therapist served in a therapeutic role for the client or his or her immediate family or has had other involvement that may compromise the counselor, social worker, or marriage and family therapist's objectivity. * * * Although the court may require the counselor, social worker, or marriage and family therapist to testify as a fact witness regarding factual information he or she became aware of in a professional relationship with a client, that counselor, social worker, or marriage and family therapist shall decline the role of expert witness who gives a professional opinion regarding the custody, visitation and/or guardianship issues.

Ohio Adm.Code 4757-6-01(F).

**{¶53}** According to Swank, Fox violated this Rule by testifying in the role of an expert as to whether Swank should have visitation with the minor child. We disagree.

**{¶54}** As an initial matter, no objection was raised to Fox' testimony. Any error in its admission, therefore, must rise to the level of plain error. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108.

**{¶55}** Fox' testimony regarding visitation between Swank and the minor child was relevant as evidence of the "interaction and interrelationship" between mother and child, a necessary consideration in evaluating the best interests of the child. R.C. 2151.414(D)(1)(a). Although Fox testified that she did not believe that Swank should have visitation with the child, this testimony was more akin to factual testimony rather than expert opinion testimony. Swank's visitation with the child interfered with the

15

child's own therapy and hindered Fox' efforts to address the child's sexual abuse issues. Accordingly, it related to the child's best interests and was not a recommendation regarding the ultimate custodial issue. The issue of visitation, per se, was not before the court.

{¶56} Finally, assuming, arguendo, that Fox' testimony violated her ethical duty as a counselor, this fact had no bearing on the admissibility of her testimony. Given that Fox' testimony regarding the suspension of visitation and the reasons therefor was relevant to the issue before the court, it was admissible regardless of whether it was ethical for Fox to give the testimony. *Compare State v. Montgomery*, 2013-Ohio-4193, 997 N.E.2d 579, ¶ 36 (8th Dist.) ("violations of the Rules of Professional Conduct have no bearing on the *admissibility* of evidence").

{¶57} The first assignment of error is without merit.

{¶58} Under the second assignment of error, Swank argues that the evidence before the juvenile court did not clearly and convincingly show that a grant of permanent custody to Job and Family Services was in the minor child's best interests, particularly in light of the facts that Swank was substantially case-plan compliant, had maintained her sobriety and mental health for the prior thirteen months, and had a stable living environment. We disagree.

{¶59} Swank's effort to address her mental health and substance abuse issues, while commendable, are only one factor to consider in the dispositional phase of juvenile proceedings, "since the best interests and welfare of that child are of paramount importance." *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 103 ("[w]hile the parents'

16

progress is measured in part by their completion of the case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody"). The balance of all relevant factors clearly and convincingly favors the grant of permanent custody to Job and Family Services.

**{¶60}** Swank lacks the present ability to parent her daughter, a fact she admitted at the hearing. While she has stable housing for herself, the housing is not suitable for the child. There was no testimony that Swank would be able to furnish such housing in the future. Swank's recent conviction for theft and involvement with a sexually oriented offender demonstrate a lack of judgment that would hinder her ability to effectively parent the child.

**{¶61}** The minor child has special needs, including cerebral palsy, ADHD, and a history of sexual abuse that requires her constant supervision. The foster family with which the child lives has been able to address these needs; Swank's ability to do so is doubtful.

**{¶62}** Admittedly, Swank recognized her limitations as a parent and only sought visitation with the minor child, such as through a PPLA. Yet there was evidence that Swank's contact with the child hindered the child's ability to make progress with her own mental health issues. There was testimony that the child was aware of and affected by Swank's relapses and was fearful that she would not protect her, which fear is justified in light of her recent involvement with Goff, a man with a conviction for domestic violence as well as a sex offense involving a minor.

**{¶63}** Finally, there was testimony that the minor child desired and would benefit from a permanent custodial arrangement. As Fox testified, the child "is floundering right

17

now because she knows she is not in a permanent home and she has watched her sister gain that permanency." As Morrison testified, the child "needs more happy days and I think * * * that's going to happen through permanent custody when she's in a family that will take care of her." This court has observed that a PPLA is akin to temporary custody where the children services agency remains the supervising authority and does not preclude the agency from seeking permanent custody. *In re B.E.S.*, 11th Dist. Trumbull No. 2013-T-0098, 2014-Ohio-346, ¶ 57. In the present case, it has been over two years since Job and Family Services received temporary custody of the child. The imposition of a PPLA at this point in the proceedings would not provide the stability of a permanent grant of custody and would not serve the best interests of the child.

{¶64} The second assignment of error is without merit.

{¶65} For the foregoing reasons, the Judgment of the Lake County Court of Common Pleas, Juvenile Division, granting Job and Family Services' Motion for Permanent Custody, is affirmed. Costs to be taxed against the appellant.


TIMOTHY P. CANNON, P.J.,

CYNTHIA WESTCOTT, J.,

concur.

18