[Cite as *In re J.G.*, 2016-Ohio-896.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| J.G., NEGLECTED CHILD. | : | |
| | : | **CASE NO. 2015-L-102** |
| | : | |
| | : | |

Civil Appeal from the Lake County Court of Common Pleas, Juvenile Division, Case No. 2013 NG 01020.

Judgment: Affirmed.

*Christopher J. Boeman,* P.O. Box 583, Willoughby, OH 44096 (For Appellant-Father).

*Karen L. Hummel,* Hummel Law, LLC, 401 South Street, #2-B, Chardon, OH 44024 (For Appellant-Mother).

*Charles E. Coulson,* Lake County Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077, and *Stephanie G. Snevel,* Special Prosecutor, P.O. Box 572, Wickliffe, OH 44092 (For Appellee).

DIANE V. GRENDELL, J.

{¶1} Appellant, Robert Grimes, appeals the Judgment Entry of the Lake County Court of Common Pleas, Juvenile Division, granting appellee, Lake County Department of Job and Family Services', Motion for Permanent Custody. The issue before this court is whether it may be determined that it is in a child's best interests that parental rights be terminated despite some improvement in the parents' abilities to parent the child and

compliance with the case plan.  For the following reasons, we affirm the decision of the court below.

{¶2}   On May 28, 2013, the Lake County Department of Job and Family Services filed a Complaint, alleging J.G., age six (dob December 2, 2006), to be neglected and dependent as defined in R.C. 2151.03(A)(2) and 2151.04(C), respectively.

{¶3}   On May 30, 2013, Attorney Paul E. Miller was appointed guardian ad litem for J.G.

{¶4}   On July 1, 2013, J.G. was found dependent with the consent of the parties.[1]  The juvenile court granted Job and Family Services protective supervision of J.G.

{¶5}   On November 26, 2013, Job and Family Services moved for and was granted emergency temporary custody of J.G.  The sunset date for termination of the temporary order was established as November 26, 2014.  *See* R.C. 2151.353(G).

{¶6}   On December 4, 2013, Job and Family Services filed a Motion for Temporary Custody.

{¶7}   On February 7, 2014, Job and Family Services was awarded temporary custody of J.G. with the consent of the parties.

---

1. The dependency adjudication was based on the following factual findings: "On or between the 6th day of April, 2013, and the 16th day of May, 2013, in the City of Willoughby, Lake County, State of Ohio, said child's condition or environment was such as to warrant the state in the best interest of the child, in assuming the child's guardianship; specifically, on April 6, 2013, 911 was contacted three times regarding substance abuse issues for Mother, Jessica Sundberg, and Mr. Grimes.  On April 6, 2013, Ms. Sundberg directed JG to contact 911 after Mr. Grimes acted strangely in the home and then walked down the street.  After 911 was called, Ms. Sundberg stated she consumed 11 prescription pills, passed out on a coffee table and urinated on herself.  Ms. Sundberg drinks alcohol regularly and becomes out of control when she is intoxicated.  Ms. Sundberg has given JG some of Mr. Grimes' prescription medication.  On May 1, 2013, Ms. Sundberg was intoxicated and assaulted Mr. Grimes.  As a result, Ms. Sundberg was charged with disorderly conduct."

{¶8} On October 22, 2014, Job and Family Services filed a Motion to Extend Temporary Custody.

{¶9} On December 10, 2014, Job and Family Services' temporary custody of J.G. was extended for six months, until May 26, 2015, with the consent of the parties.

{¶10} On May 22, 2015, Job and Family Services filed a Motion for Permanent Custody.

{¶11} On July 2, 2015, the guardian ad litem filed an Emergency Motion to Appoint Attorney for Minor Child, upon the belief that "a conflict has arisen between the Guardian's obligations as Guardian ad Litem and attorney," and "to avoid any potential conflict from this point forward in the proceedings."

{¶12} On July 8, 2015, the juvenile court appointed counsel to represent J.G.

{¶13} On August 4, 2015, the Report of the Guardian ad Litem was filed. Attorney Miller recommended that Job and Family Services be awarded permanent custody of J.G. With respect to J.G.'s wishes, Miller believed that they had been accurately described as "ambivalent": "[J.G.] says he would like to return to his parent's [sic] home. Yet [he] appears to be thriving in his Foster Parent's home. [J.G.] doesn't really appear to appreciate the situation but has said on several occasions that he would like to return home. That is why this Guardian asked that he be appointed an attorney. [J.G.] has also expressed to the social worker, this Guardian and the Foster Parent that he would be happy staying with the Foster Parent."

{¶14} On August 18, 19, and 20, 2015, trial was held on the Motion for Permanent Custody and other pending matters. The following testimony was presented at trial:

3

**{¶15}** Jennifer Mix, an ongoing social worker with Lake County Department of Job and Family Services, testified that, in November 2007 (J.G. was eleven-months-old), she was assigned to work with J.G.'s family due to "concerns of some instability in the home regarding substance abuse issues and mental health issues." Jessica was abusing alcohol and Robert was abusing prescription medication in addition to demonstrating "bizarre" behaviors. J.G. was adjudicated dependent in December 2007 and, in April 2009, Job and Family Services was awarded temporary custody of J.G.

**{¶16}** Job and Family Services had custody of J.G. for about fourteen months. Despite some relapses with regard to substance abuse, Jessica and Robert were generally case plan compliant. J.G. was returned to his parents' custody in June 2010, and, in September 2010, the case was closed.

**{¶17}** Doug Battisti began providing counseling services to the family in October 2013. His "goals were to identify triggers and such for [J.G.'s] anger and aggression in the home and figure out what needed to happen in the home to adjust the home experience to * * * teach him coping skills, what we call soothing skills." He testified that Jessica and Robert accused each other of substance abuse and were indifferent to the efforts of Crossroads (a community-based service organization for children) to provide instruction. He noted J.G.'s ability to play his parents off against each other. In August 2014, he ceased working with the family as it was determined that progress could not be made until the parents addressed their mental health and substance abuse issues.

**{¶18}** Rochelle Davis, a case manager with Crossroads, testified that she assisted Jessica and Robert in dealing with J.G.'s behaviors in the home. After J.G.'s

4

removal from the home in November 2013, Davis continued working with the foster mother.

{¶19} Davis described J.G.'s behavior upon removal thus: "He was physically aggressive towards his foster mom, destructive [of] property, unsafe in the community, meaning he would run off [from] his foster mom, he was lying, attempting to be manipulative, could not tolerate the word 'no,' was not following directions, would not be redirected, huge emotional meltdowns." A behavioral system of rewards and consequences, with an emphasis on consistency, was developed and implemented in the foster home, with the result that J.G.'s behavior became manageable.

{¶20} Davis noted that J.G.'s behavior is influenced by his interaction with his parents. A disappointing visit with his parents or anxiety over his custody triggers negative behaviors while positive interaction with his parents improves his behavior.

{¶21} Donna Scott, an early childhood clinical coordinator with Crossroads, testified that she began working with J.G. (then age four) and his family in 2011. At the time, J.G. was in a therapeutic preschool program with symptoms of withdrawal, anxiety, and anger. Individual counseling for J.G. and family therapy services were provided until the fall of 2013, when Job and Family Services took custody of J.G.

{¶22} In November 2014, Scott again began working with the family. She noted that neither Jessica nor Robert were able to effectively engage J.G. or respond to his needs. She encouraged the parents to provide J.G. with structure and to communicate with him as ways of lessening his anxiety. She also impressed upon Jessica and Robert the need to work together as parents in order to redirect and/or set limits on J.G.'s behaviors. J.G. continues to show aggressive and agitated behaviors as a result

5

of the chronic stressors in his life and has been diagnosed with adjustment disorder with mixed emotions and conduct.

{¶23} Scott testified that both Jessica and Robert have shown recent progress in their parenting abilities, responding to J.G.'s "cues" and, in particular, working together as parents. However, they have not demonstrated as much progress as she believes is necessary to parent J.G. effectively.

{¶24} Joseph Weber, a community psychiatric support treatment supervisor at Beacon Health, began treating Jessica in December 2014 for depression and anxiety. Jessica currently takes Zoloft and Buspar. Jessica self-reports that her depression is improving but that there is still anxiety.

{¶25} Erica Patfield, a dual diagnosis counselor at Beacon Health, has been Jessica's therapist since December 2014. Patfield testified that there has been a reduction of Jessica's symptoms of depression and anxiety. She also noted that Jessica has self-reported as being sober since July 2014.

{¶26} Alf Bergman, a psychiatrist and medical director at Beacon Health, began treating Robert in February 2015 for depression and attention deficit hyperactivity disorder (ADHD). Robert currently takes Prozac and Ritalin to treat his conditions. Dr. Berman describes Robert as "mildly ill" and his condition as stable.

{¶27} David Zavasky, a dual diagnosis counselor at Beacon Health, has been Robert's therapist since March 2014, when Robert was referred for drug, alcohol, and mental health evaluations. Zavasky testified that Robert began abusing benzodiazepines at an early age. In November 2014, Robert admitted taking a "benzo" while staying at Project Hope for the Homeless and that "he felt he did not have all the

skills or tools to say 'no,' if it was directly offered to him." The therapy focused on understanding the causes of Robert's anxiety and learning coping skills to address those situations. Zavasky described Robert's progress in therapy as significant and believes that Robert has not abused drugs since the incident in November.

{¶28} Jamie Mapes, a community psychiatric support treatment supervisor at Beacon Health, began working with Robert in November 2014 and has been his case manager since February 2015. In November 2014, Robert was observed acting strangely at Beacon Health and claiming that he was stressed from being at a homeless shelter. Mapes took Robert for a drug screen at Lake West and he tested positive for benzodiazepines. Mapes was aware that a person named Troy, whom they met at the homeless shelter, was staying with Robert and Jessica. Robert has asked Mapes for money and Troy was supposed to help pay living expenses. Mapes advised Robert that Troy should not be living with him in light of the possibility that J.G. returns home.

{¶29} Stacy DeLeone, an ongoing social worker with Job and Family Services, has supervised visits between J.G., Robert, and Jessica since February 2015. These supervised visits occurred twice a week either at Job and Family Services or, for a time, at the library in Painesville. The visits at Job and Family Services were observed through a one-way mirror.

{¶30} DeLeone testified about Robert's bizarre behavior, particularly a tendency to speechify, that is, to speak about various subjects at random that do not have any relevance to the immediate situation. Robert also breaks into song or repeats over and over certain phrases. J.G. and Jessica typically respond by ignoring Robert, although on occasion they will ask him to stop.

7

**{¶31}** DeLeone reported a peculiar incident that took place during visitation at the library. A man called "Mr. Bobo" apparently bicycled to the library from Fairport Harbor with a large army bag containing a stereo speaker which he gave to Robert. Mr. Bobo was introduced to J.G. DeLeone described the encounter as "extremely awkward." On another occasion, Robert wanted to wrestle with J.G. at the library, which DeLeone pointed out was not appropriate.

**{¶32}** DeLeone noted that J.G.'s aggressiveness has increased as the date of the permanent custody hearing approached. J.G. has insulted DeLeone without any consequence being imposed by Jessica or Robert.

**{¶33}** DeLeone monitors Robert's prescriptions by counting his pills, although he does not always bring all his medication to the visits.

**{¶34}** Jamie Higginbotham, an ongoing social worker with Job and Family Services, has supervised both of J.G.'s cases. The concerns in the 2007 case were Jessica's alcohol use and Robert's abuse of prescription drugs and mental health issues.

**{¶35}** Higginbotham again became involved with the family in June 2013 when Jessica was arrested for domestic violence and disorderly conduct. Again, the concerns were Jessica's alcohol use and Robert's abuse of prescription drugs and mental health issues. J.G. was removed in November 2013 after being struck in the head with a cell phone during an altercation between Jessica and Robert. Jessica was going to be arrested and Robert was deemed unable to care for J.G. after consuming a large number of pills.

**{¶36}** Beginning in May 2014, Job and Family Services began to allow Jessica and Robert to have unsupervised visitation with J.G. with the goal of reunifying the family. Job and Family Services began working with Joshua Sundberg, J.G.'s maternal half-brother, to help monitor the situation in the household. In June 2014, Jessica took J.G. to Joshua's house because Robert had taken an excessive number of pills and was acting aggressively and irrationally. Ultimately, Robert was hospitalized at Laurelwood. In July 2014, there was an incident where Jessica was intoxicated. Thereafter, unsupervised visitation was terminated. Supervised visitation resumed once per week, later increased to twice per week, and was eventually moved to the library. After the encounter with Mr. Bobo in April 2015, visitation only occurred at Job and Family Services and the permanent custody motion was filed.

**{¶37}** Jessica and Robert are consistent in utilizing the services made available to them. The concern is that they do not actively participate or follow through and little progress is made. Jessica initially completed several alcohol programs yet continued to drink and "hasn't been in a program currently." Robert was terminated from a parenting program because his behaviors made it impossible to accomplish anything. Jessica and Robert also have issues in dealing with J.G. appropriately. They expose him to situations and conversations that are not age appropriate which noticeably stresses him. At a recent visit they were discussing corporal punishment and Robert's colonoscopy with J.G., who took off his belt and began snapping and swinging it at people and things. At one point, J.G. ran out of the room. These behaviors were allowed to continue for about a half hour before Jessica took the belt from him. J.G. has an individualized education program (IEP) at school because of his behaviors.

9

Higginbotham believes the trauma he experiences with Jessica and Robert exacerbate his behaviors and that they do not know how to manage him.

{¶38} Higginbotham acknowledges that Jessica and Robert have benefited from the treatment they have received from Beacon Health and that they are in compliance with Beacon Health's treatment recommendations. She also acknowledges that there has been no evidence of Jessica drinking since July 2014 when she claims to have quit. The parents, however, have been struggling with the same issues for almost J.G.'s entire life and he needs permanency and stability to address his own issues. Higginbotham notes that none of the current service providers presently recommend unsupervised visitation.

{¶39} Joy Biggs, an ongoing social worker with Job and Family Services, was assigned to J.G.'s case in May 2013. At the time, the family resided in an apartment at 34188 Euclid Avenue, Willoughby. The case plan goals were for Jessica and Robert to have drug/alcohol and mental health assessments and to complete a parenting program. They were to follow all recommendations. Also, J.G. was to have a mental health assessment.

{¶40} Jessica completed a drug and alcohol program in 2013 but continued drinking. In 2014, she was receiving mental health counseling at Signature Health. In October 2014, Jessica quit her job and lost her health insurance, which interrupted her counseling. In December 2014 she was assessed by Beacon Health and has used their services since that time. Jessica claims to have quit drinking in July 2014. She has had no positive screens since that time, but has not completed all screens as requested by Job and Family Services.

{¶41} Robert began services with Beacon Health in January 2014 and has continued with them since then. In December 2014, Robert tested positive for benzodiazepines which, it was reported, he received while staying at a homeless shelter. Job and Family Services filed a motion to show cause and Robert admitted to being in contempt. Robert has not had any positive drug screens since December 2014.

{¶42} Jessica and Robert twice received parenting services from Crossroads (Battisti and Davis) which were terminated twice due to the substance abuse issues. Thereafter, Scott worked with them doing individual parenting counseling.

{¶43} J.G. was removed from his parents' custody in November 2013, after being struck in the head with a cell phone during a domestic altercation between Jessica and Robert. Jessica was intoxicated and arrested and Robert's behavior was abnormal to a degree that it was determined he could not care for J.G. Job and Family Services' efforts to return J.G. to Jessica's and Robert's custody were frustrated by the incidents in the summer of 2014 (Jessica's intoxication and Robert's hospitalization) and by Robert's positive drug screen in December 2014. Library visitation was suspended after the incident with Mr. Bobo in May 2015.

{¶44} Biggs learned that Jessica and Robert met Mr. Bobo at the homeless shelter and that he had been living with them. Jessica and Robert were upset that she had learned this but wanted him to leave because he did not contribute to rent or food.

{¶45} Patrolman Shane Rahz of the Willoughby Police Department testified that, on October 27, 2013, he went to an apartment at 34188 Euclid Avenue, from which dispatch had received a silent call. Rahz found Jessica leaning over and yelling at

Robert with J.G. (age six) in the room. J.G. explained the situation to Rahz. Jessica was intoxicated and had choked Robert, who had red marks about his neck. Rahz charged Jessica with domestic violence, to which she later pled guilty.

**{¶46}** Patrolman Matthew Scott Jackson of the Willoughby Police Department testified that, on June 12, 2014, he responded to a dispatch on Euclid Avenue. He encountered Robert, who was looking for his son. At Robert's request, Jackson drove him to the hospital.

**{¶47}** Patrolman Paul Sciarrino of the Willoughby Police Department testified that, on June 14, 2014, he responded to a dispatch at the Trenton Place Apartments on Euclid Avenue. A man had called and reported that someone had kidnapped his son. Sciarrino encountered Robert who was totally incoherent. Sciarrino was able to determine that J.G. was with Joshua. Sciarrino took Robert to Lake West for a psychiatric evaluation (he "pink slipped" him).

**{¶48}** Jennifer Adams, J.G.'s foster mother, testified regarding the difficulties in controlling J.G.'s behavior when he was first placed in her home. Adams notes that J.G. is very aware of his parents' substance abuse issues. She also testified that a consistent daily routine helps reduce his anxiety. Adams would be interested in adopting J.G. if the permanent custody motion is granted and would be open to allowing him to have continuing contact with his parents.

**{¶49}** John Kinsel, an infant and early childhood intervention specialist, testified as an expert in child development and parent-child relationships. He performed a parenting assessment on Jessica and Robert in September 2014, and again in April 2015. He observed that Jessica regularly brought snacks, toys, and books to the

12

visitations which J.G. liked and looked forward to, although she kept the toys and books until J.G. could return home. Kinsel felt that Jessica's relationship with J.G. functioned reasonably well and that there were no impediments to developmental progress. He characterized the relationship as "perturbed," meaning that its functioning was less than optimal largely due to inconsistency. Jessica complained that she felt that she was detaching from J.G. due to the limited visitation, a phenomenon Kinsel observed.

{¶50} Kinsel observed that Robert wanted to engage with J.G., but lacked the skill or psychological presence to do so effectively. While J.G. engaged with Jessica, he tended to ignore Robert. Kinsel observed that persons with significant mental illness tend to focus on themselves making engagement with others more difficult. He characterized the relationship between J.G. and Robert as "disordered," meaning that their interactions were rigidly maladaptive and did not promote the social or emotional development of the child.

{¶51} Kinsel also noted that there was very little verbal communication between Jessica and Robert and a lack of affection between the family members. Neither Jessica nor Robert was effective in setting limits for J.G., who was able to control the dynamic of the family's interactions.

{¶52} Kinsel recommended that J.G. remain in his current placement for at least six months before considering a return to home visitation, provided Jessica and Robert continue to progress. If Job and Family Services was granted permanent custody, Kinsel recommended that J.G. be allowed continued contact with his parents.

{¶53} Joshua Sundberg, J.G.'s maternal half-brother (age twenty-eight at the time of hearing), testified to Jessica's decades-long struggle with alcohol. Although

13

Joshua considered having J.G. live with him, he believes that J.G. is "where he needs to be" with his foster mother. Joshua speaks with the foster mother "at least once a week" and visits J.G. once or twice a month. Joshua noted that J.G. used to be "kind of a violent kid," but, since he has been with his foster mother, he is "a way different child." The foster mother and J.G. interact as "mother and son," although J.G. knows she is not his mother and she does not present herself as his "new mom."

{¶54} In July 2014, J.G. was being transitioned back into Jessica's custody (Robert had been hospitalized the previous month). On July 4, 2014, Joshua left J.G. with Jessica that afternoon and would return that evening to take him to see fireworks. When he returned, Jessica was intoxicated. Joshua has not had contact with Jessica since that time and feels strongly that she should not regain custody of J.G.

{¶55} Jessica Sundberg testified that she currently lives at 3845 Oakhill Lane in Willoughby with Robert, whom she has been with for ten years. She is not currently employed. J.G. is their only child, but she has three other children. She described J.G. as a very active child who needs a routine and to be entertained. J.G. did not begin to be destructive until he went to school. He struggles with schoolwork.

{¶56} Jessica testified that she was drinking in October 2013, when J.G. was removed. She drank because of the stress of her work (managing a Wendy's) and because of Robert's abuse of prescription drugs. Drinking was a way for her to self-medicate. She did not drink constantly and had periods of sobriety. When she lost her job in October 2014, she also lost her insurance and car. The treatment she has received at Beacon Health, both counseling and medicine, has helped her with her drinking.

**{¶57}** Jessica admitted that she was drinking on July 4, 2014, but claimed that it was only one or two drinks and that she was not intoxicated.

**{¶58}** Jessica testified that she missed visitation with J.G. on Christmas Eve, 2014, because she could not afford a bike that he wanted and was feeling guilty. At this time, she and Robert lost their apartment on Euclid Avenue. They were at Project Hope for a month before renting their present apartment. Troy Bobo lived with them from December 2014 until about a week before the permanent custody hearing began (August 18-20).

**{¶59}** Jessica admitted to missing screens. On one occasion, the weather was too cold for her to travel to the lab by bus. On another occasion, she was not aware that a screen had been requested. On another occasion, she was only given a few minutes' notice that transportation would be arriving to take her to a screen, and she did not think this was a reasonable request.

**{¶60}** Jessica does not believe the problems with J.G. are due to her parenting skills but, rather, her personal issues. She is now more serious about regaining custody of J.G., and this will keep her sober.

**{¶61}** Robert Grimes testified that he currently lives with Jessica and has not worked since June 2014. At this time, he suffered a massive "manic attack," which he believes was caused by the Wellbutrin he was taking to quit smoking. He also admitted to taking Ambien at this time. He admitted taking Valium while staying in the shelter at the end of 2014. After forty-seven years, he is now properly diagnosed and only takes Ritalin and Prozac.

**{¶62}** Robert testified that drinking and pills have caused the present situation and, without them, his would be a normal household. Robert testified that Jessica has not had a drink since July 2014 and that he has been clean since leaving the shelter. He has been "scared straight on this permanent custody issue," loves J.G., and asked the court to "not take him away."

**{¶63}** On August 25, 2015, the juvenile court rendered its judgment, granting Job and Family Services' Motion for Permanent Custody.

**{¶64}** On September 15, 2015, Robert filed a Notice of Appeal.[2]

**{¶65}** On appeal, Robert raises the following assignment of error:

**{¶66}** "[1.] The trial court erred, and abused its discretion, when it granted permanent custody to the Department pursuant to O.R.C. §2151.414(B)(1), because the trial court's analysis of the best interest factors set forth in O.R.C. §§2151.414(D)(1)(a) through (e) was clearly in error and unsupported by the evidence."

**{¶67}** A parent's right to raise his or her child is an "essential" and "basic civil right." (Citation omitted.) *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). In recognition of the fundamental importance of the natural parental relationship, the termination of parental rights has been described as "the family law equivalent of the death penalty." (Citation omitted.) *In re Williams*, 11th Dist. Geauga Nos. 2003-G-2498 and 2003-G-2499, 2003-Ohio-3550, ¶ 35.

**{¶68}** Upon the motion of a public children services agency requesting permanent custody of a child pursuant to R.C. 2151.413, the juvenile court may grant the motion "if the court determines at the hearing held pursuant to [R.C. 2151.414(A)],

---

2. Jessica was included in the Notice of Appeal, but has not filed a brief or otherwise participated in the appeal.

16

by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and * * * [t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d); *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 8-22.

> (1) In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D).

{¶69} The Ohio Supreme Court "has defined clear and convincing evidence as 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable

17

doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶70} In the present case, the juvenile court made the following findings with respect to J.G.'s best interests:

> [(a)] Historically, [J.G.] has had consistent visits with Mother and Father while in the custody of the Department. [J.G.] has contact with his adult sibling as it is arranged through [his] foster mother. The Child has a good relationship with the foster mother who provides a safe and adequate home for the child.

> [(b)] [J.G.] has expressed ambivalence and loyalty toward both his foster mother and his biological parents when discussing permanent custody. [J.G.] has shown concern with the idea of unsupervised contact with Mother and Father. He has expressed a desire to go home and a desire to stay with his foster mother.

> [(c)] [J.G.] has been in the temporary custody of the Department since November 26, 2013.

> [(d)] [J.G.] is in great need of legal and permanent placement. This type of placement cannot be achieved without permanent custody being awarded to the Lake County Department of Job and Family Services. There are no relatives who can care for [J.G.] or provide him with a permanent placement. Mother and Father have failed to

18

adequately satisfy case plan goals and adequately remedy the situations that brought [J.G.] into the temporary custody of the Department despite extensive intervention by the agency and outside service providers.

[(e)] The Court finds that none of the factors in R.C. 2151.414(E)(7) to (11) apply.

{¶71} Robert contends the evidence does not support the juvenile court's determination regarding J.G.'s best interests. He asserts that there can be no ambivalence with respect to J.G.'s wishes as he "clearly did not wish to have his parents permanently severed from his life." Appellant's brief at 31. Moreover, when a child is represented by counsel, "it is axiomatic that the Trial Court must consider that the minor child's attorney is speaking directly for the minor child when arguing the case." Appellant's brief at 32.

{¶72} On the contrary, although J.G. desired to return to his parents' custody, there was also evidence that J.G. appreciated their shortcomings and the necessity of his permanent removal. Davis (the family's case manager at Crossroads) reported that J.G. was aware that he would return home if his parents were "doing good," but, if not, he would stay with his foster mother where he would be "safe." According to Higginbotham (case supervisor for Job and Family Services), J.G. was concerned that things would "get bad again" if he returned home. Higginbotham recognized that J.G. was in a difficult position as he unquestionably loves his parents and that the situation exacerbated his behavioral issues. Finally, Attorney Miller (the guardian ad litem) testified in his report and at the permanent custody hearing that J.G. had alternatively

19

expressed a desire to be with his parents and remain with his foster mother. J.G.'s divided loyalty is wholly understandable. The fact that the guardian requested an attorney to advocate for J.G. a position that he could not recommend does not alter the fact that J.G.'s feelings regarding his custody were ambivalent. It is the role of the attorney to zealously represent J.G. for the purpose of vindicating his desire to remain with his parents. The guardian, on the other hand, must advocate for J.G.'s best interests. *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232, 479 N.E.2d 257 (1985). At law, these interests may be efficiently divided between guardian and counsel. In reality, there is no reason to suppose that these, at times, conflicting interests should not manifest themselves in the wishes of the young persons who are the subjects of these proceedings. *In re Lattimer*, 3rd Dist. Logan Nos. 8-02-34, et al., 2003-Ohio-3690, ¶ 16 ("[i]t is natural and expected that * * * children would miss and want to reunite with their parents[,] [b]ut this alone cannot be the sole basis on which to determine the best interest of the children").

**{¶73}** Robert also challenges the juvenile court's finding that he has failed to adequately satisfy the case plan goals. Robert notes that Job and Family Services never filed a show cause motion against Jessica and that Robert's last positive drug screen occurred eight months before the permanent custody hearing. Several witnesses, including Jessica and Robert, testified that they have benefited from the parenting classes and other services provided to them and are able to apply what they have learned. In particular, Jessica and Robert have learned to work together in parenting J.G. and Robert has striven to be more engaged with J.G. Finally, Robert contends that the issues that led to J.G.'s removal from the home – domestic violence

and alcohol and drug abuse – have been remedied. There have been no reported incidents of violence or abuse since the beginning of 2015.

{¶74} As a factual matter, the record before this court supports the juvenile court's conclusion that, while Jessica and Robert may have satisfied the case plan goals, they have not adequately satisfied those goals so as to be able to provide J.G. a secure placement. The present case had been pending for over twenty-six months at the time of the permanent custody hearing. As of December 2014 (eighteen months into the case), Jessica and Robert were staying in a homeless shelter, Robert was abusing drugs, and Jessica had just begun working with the therapists at Beacon Health. Both Jessica and Robert have demonstrated progress with their personal issues and parenting skills since that time. However, the progress has not been to such an extent that reunification was possible or even recommended at the time of the permanent custody hearing.

{¶75} Scott (an early childhood clinical coordinator working with the family since 2011) felt that Jessica and Robert had not made as much progress as she would have hoped given the time and resources provided to the family. Higginbotham testified that, at the time of the permanent custody hearing, none of the service providers working with the family were recommending the resumption of unsupervised visits. Kinsel (an infant and early childhood intervention specialist) opined that Job and Family Services should maintain custody of J.G. for at least six months before considering J.G.'s return to Jessica's and Robert's custody. These concerns with returning J.G. to their custody do not solely stem from domestic violence and substance abuse issues (although they

continue to be legitimate concerns), but also from questions regarding their ability to parent J.G. effectively in light of his behavioral issues and other needs.

**{¶76}** In light of the parents' limited progress, a few points should be made. "Once a child has been found to be 'dependent' as defined in R.C. 2151.04, the 'best interests' of the child are the primary consideration in determining whether an award of permanent custody is justified pursuant to R.C. 2151.353(D)." *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), syllabus.

> [T]he *fundamental* or *primary* inquiry at the dispositional phase of these juvenile proceedings is not whether the parents of a previously adjudicated 'dependent' child are either fit or unfit. The mere fact that a natural parent is fit, though it is certainly one factor that may enter into judicial consideration, does not *automatically* entitle the natural parent to custody of his child since the best interests and welfare of that child are of paramount importance.

(Emphasis sic.) *Id.* at 106; *In re M.S.*, 11th Dist. Lake No. 2014-L-036, 2014-Ohio-3184, ¶ 59 (the mother's "effort[s] to address her mental health and substance abuse issues, while commendable, are only one factor to consider in the dispositional phase of juvenile proceedings"); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 103 ("[w]hile the parents' progress is measured in part by their completion of the case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody").

**{¶77}** Also, it was the General Assembly's purpose in establishing the present procedures for the termination of parental rights "to prevent children from lingering in

22

foster care." *In re B.W.*, 9th Dist. Medina No. 12CA0016-M, 2012-Ohio-3416, ¶ 44; *In re S.L.,* 3rd Dist. Defiance Nos. 4-10-09 and 4-10-10, 2010-Ohio-6380, ¶ 58 ("the best interests of children include not having to linger in foster care awaiting their mother to become a responsible parent").  The present case had already exceeded the original sunset date by six months when the decision was made to move for permanent custody.

{¶78} Considering all relevant factors, particularly the length of time the case has been pending, the parents' limited progress in addressing their personal and parenting issues, and J.G.'s own needs, the evidence of record clearly and convincingly favors the grant of permanent custody to Job and Family Services.

{¶79}  The sole assignment of error is without merit.

{¶80} For the foregoing reasons, the Judgment of the Lake County Court of Common Pleas, Juvenile Division, granting Lake County Department of Job and Family Services' Motion for Permanent Custody, is affirmed.  Costs to be taxed against appellants, Robert Grimes and Jessica Sundberg.


TIMOTHY P. CANNON, J.,

THOMAS R. WRIGHT, J.,

concur.