[Cite as *In re M.L.*, 2019-Ohio-3787.]

# IN THE COURT OF APPEALS OF OHIO

# TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | No. 18AP-654 |
| M.L. et al., | : | (C.P.C. No. 14JU-4087) |
| [T.P. | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

---

# D E C I S I O N

## Rendered on September 19, 2019

---

**On brief**: *Sharon K. Carney*, for appellee Franklin County Children Services.

**On brief**: *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant.

---

**APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch**

BROWN, J.

{¶ 1} T.P. ("father"), appellant, appeals a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which the court granted the motion of Franklin County Children Services ("FCCS"), appellee, for permanent custody with regard to his twin sons, M.L. and M.L. ("the twins").

{¶ 2} Father and the children's mother T.L. ("mother") are the biological parents of the twins, who were born October 21, 2013. Father and mother are not married. The twins lived with mother. As a result of an investigation into facial injuries on two of mother's older children not part of the current case, mother's home was discovered to be in poor condition and the twins to be inadequately cared for.

{¶ 3} On March 28, 2014, FCCS filed a complaint in which it alleged the twins were dependent children, pursuant to R.C. 2151.04(C), and the court granted emergency

custody to FCCS the same day. On June 19, 2014, the trial court adjudicated the twins as dependent children. The court returned the twins to mother, and ordered FCCS to provide protective supervision on June 26, 2014. The trial court adopted a case plan which was revised several times.

{¶ 4} After an annual review hearing on June 19, 2015, the court removed the twins from her home, at mother's request, and granted FCCS temporary custody. Father was added to the case plan on July 29, 2016.

{¶ 5} On April 6, 2017, FCCS filed motions for permanent court commitment ("PCC") with regard to the twins. On March 12, 2018, at the request of father's counsel, the court appointed father a guardian ad litem ("father's GAL"). The court held a trial on June 11 and 12, 2018, at which mother and father appeared. Father opposed FCCS's PCC motion. The guardian ad litem ("GAL") for the twins recommended PCC be granted. On July 30, 2018, the court issued an order granting FCCS's motion for PCC. Father appeals, asserting the following assignment of error:

> The trial court committed reversible error by terminating Appellant's parental rights.

{¶ 6} Father argues in his assignment of error the trial court's decision was against the manifest weight of the evidence. R.C. 2151.414 governs the procedure for granting permanent custody of a child to an agency such as FCCS. Under R.C. 2151.414(B)(1), a trial court may grant permanent custody to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (d) applies. Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 7} In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case satisfied or failed to satisfy the burden of

persuasion, i.e., whether clear and convincing evidence supports each element. *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. A judgment supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *Id.* at ¶ 10, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. " 'The phrase "some competent, credible evidence" * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence *is* competent and credible.' " (Emphasis sic.) *Id.*, quoting *Eastley* at ¶ 15.

{¶ 8}    " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre* at ¶ 10, citing *Eastley* at ¶ 20.

{¶ 9}    "In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct." *Sparre* at ¶ 12. "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 10} In the present case, father does not dispute the trial court correctly found clear and convincing evidence establishes that the requirement in R.C. 2151.414(B)(1)(d) was met.  In other words, the evidence shows the twins were in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

{¶ 11} Once the trial court finds one of the circumstances in R.C. 2151.414(B)(1)(a) through (d) applies, the trial court then must determine whether a grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Here, father contests only the trial court's findings regarding the best-interest factors. R.C. 2151.414(D) provides that, in determining the best interest of the child, the court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, (2) the wishes of the child, as expressed directly by the child or through the child's GAL, with due regard for the maturity of the child, (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (5) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. The factors set forth in R.C. 2151.414(E)(7) through (11) include: (1) whether the parents have been convicted of or pled guilty to various crimes, (2) whether medical treatment or food has been withheld from the child, (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drug abuse, (4) whether the parent has abandoned the child, and (5) whether the parent has had parental rights terminated with respect to a sibling of the child.

{¶ 12} In his brief, father contests the following finding by the trial court:

> None of these Children can be placed with a Parent now or within a reasonable time as the Parents are not able or willing to meet the needs of the Children. The Children need a permanent placement now. It is abundantly clear that a legally secure permanent placement cannot be achieved for the Children without an order of permanent custody to the Agency.

(Jgmt. Entry Granting Permanent Custody at 15.)

{¶ 13} The above finding relates to the best-interest factor found in R.C. 2151.414(D)(1)(d). Father argues the entire case surrounding his desire to have the twins

placed with him seemed to center on the unsubstantiated allegation that he had marijuana plants in his home. Father points out FCCS indicated it was happy to work with him to achieve custody of the twins prior to the home study that revealed the alleged marijuana plants, and it was at this point that the overnight visits terminated. Father contends that although FCCS investigated and found the allegations of marijuana plants in the home unsubstantiated, the overnight visits never resumed, and there was nothing he could do thereafter to rectify the situation. Father further asserts that, although Brandon Dodson, the caseworker, testified that, in other cases, parents had completed an alcohol and drug assessment and continued drug screening, Dodson admitted he never asked father to do such an assessment. Dodson testified he had no concerns regarding father's drug use, and father had tested positive only for alcohol once out of 29 drug and alcohol screens.

{¶ 14} We disagree with father's view of the trial court's findings surrounding the issue of the marijuana plants. In its decision, the trial court spent less than 1 page in its 18-page decision discussing the marijuana issue during its discussion of father's completion of the case plan components, specifically the component that he maintain a clean and safe home. The court found Dodson observed three plants in the bedroom of father's home and three large jars of a green leafy substance in a hallway closet. Although Dodson believed the substance and plants were marijuana, the court explained that Dodson was not concerned about father's personal use of marijuana but that the plants contained broken mirror shards on top of the soil, which posed a risk of injury to the twins. The trial court also found Dodson implied that there was a concern father was selling marijuana from his home, and there might be an increased risk of a break-in. The trial court added the GAL later saw what he believed to be a marijuana plant on the back porch of father's home. The trial court also acknowledged father's claim that the plants and dried substance were parsley that he used in witchcraft, and the broken mirror shards were to get light to the plants.

{¶ 15} The testimony at trial supported the trial court's findings. Dodson testified that when he went to father's home to conduct a home study, he found three containers with marijuana plants growing in them. Broken mirror pieces were under the plants on top of the dirt, and through his education and training, he learned that broken mirrors are

used to promote bud growth on marijuana plants. He testified that he also found three large jars full of a dried, green leafy substance in the hallway closet. Dodson stated that when he confronted father about these observations, father claimed the plants and substance in the jars were parsley he used for witchcraft. Dodson stated he was concerned because the twins could potentially put the glass or plants in their mouths and people could potentially try to break into the home to get the marijuana. After speaking with the agency attorney, Dodson asked father to meet him at the home, where Dodson planned to call police to identify the plants. Although father agreed to meet him, he never arrived at the home. After the FCCS intake department did an investigation at father's home a few days later, workers found three plants with red berries that were not marijuana. Dodson said the plants he saw did not have berries, and, regardless, parsley does not have red berries. At a later review, father initially denied there were ever any plants in the bedroom with red berries. Dodson also testified that during a home visit, multiple people came to father's back door and knocked, and father would go into the kitchen, reach into a cabinet, get something out, and return to the back door. Dodson noted it as odd behavior but did not ask father about it.

{¶ 16} Clearly, the trial court's findings regarding the marijuana issue were fully supported by Dodson's above testimony. Father mischaracterizes FCCS's concern with regard to the presence of marijuana in father's home. Dodson testified that he was not concerned father might be using marijuana but was worried about the danger of the broken mirror shards, father's possible drug dealing, and the risk of someone trying to break into the home if father was either selling drugs or possessed a large quantity of marijuana. Father also failed to acknowledge his own failings with regard to the suspension of overnight visits. Dodson testified he did not offer father a drug and alcohol assessment after the marijuana issue arose because father refused to discuss the marijuana issue and stated he would address it through the court system. Furthermore, after Dodson and father agreed to meet at his home to view the suspected marijuana, father failed to meet him. Thus, father's own refusal to work with FCCS to address and/or remedy the concerns contributed largely to FCCS's handling of the matter. For these reasons, we find father's argument, in this respect, without merit.

{¶ 17} Father also asserts he substantially complied with his case plan, which had five main components: (1) establish paternity, (2) complete random drug screens, (3) maintain income and a clean and safe home, (4) work with a parent mentor, and (5) demonstrate the ability to meet the basic needs of the children. We first note that, regarding a parent's substantial compliance with a child welfare agency's case plan, Ohio courts have recognized:

> [I]t is well-settled that the completion of case plan services alone does not equate to, or necessitate a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home. *In re Mraz*, Brown App. Nos. CA2002-05-011, CA2002-07-014, 2002-Ohio-7278, ¶ 13. A parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is "simply a means to a goal, but not the goal itself." *In re C.C.*, Cuyahoga App. Nos. 94013, 94014, 2010-Ohio-780, ¶ 25.

*In re E.B.*, 12th Dist. No. CA2009-10-139, 2010-Ohio-1122, ¶ 30; *see also In re J.G.*, 11th Dist. No. 2015-L-102, 2016-Ohio-896, ¶ 74 (finding that although the parents may have satisfied the case plan goals, they have not adequately satisfied those goals so as to be able to provide the child a secure placement); *In re Conn*, 10th Dist. No. 03AP-348, 2003-Ohio-5344, ¶ 19 (finding that substantial completion of case plan requirements does not preclude a grant of permanent custody to a social services agency).

{¶ 18} In the present case, with regard to the first component, the trial court found father has been cooperating in establishing paternity. The record demonstrates father established paternity in this case. Thus, this component weighs in favor of father.

{¶ 19} With regard to the second component, the court found that father completed 29 drug and alcohol screens and only 1 tested positive for alcohol. Dodson testified father completed virtually all of his drug and alcohol tests. Therefore, this factor also weighs in favor of father.

{¶ 20} With regard to the third component, that father maintain income and a clean and safe home, father points out that Dodson said he appeared to be employed since February or March 2017, because he came to visits displaying a badge and wearing work boots. However, father does not acknowledge that the court's discussion with regard to the marijuana issue was addressed under this factor. Although it does appear that father

was maintaining employment, the trial court's discussion of the marijuana issue, as we reviewed above, weighs against father.

{¶ 21} With regard to the fourth requirement, that father work with a parent mentor, father points out that he completed this portion of the case plan by participating in the Nurturing Father's program and following up with family support services. The trial court seemed satisfied that father completed the parenting program; thus, this factor weighs in favor of father.

{¶ 22} With regard to the fifth requirement, that father demonstrate the ability to meet the basic needs of the children, father asserts that he was employed and always maintained a clean residence, Permanent Family Solutions Network was working with him and Veterans Affairs to obtain a larger residence, and he was engaged with the twins at the visits and their bond was improving. However, the trial court raised a bevy of concerns about father's ability to meet the basic needs that father does not acknowledge or contest. The court noted that father has not raised the twins, most of his life he was incarcerated, he did not raise his other two adult children, the twins have never lived with him, and there was a delay in establishing paternity after the twins were born. These findings are confirmed by our review of the record.

{¶ 23} Importantly, the trial court noted numerous issues with father's individual therapy and joint therapy with the twins. The behavior therapist, Molly May, was to counsel father individually for the first portion of the weekly appointments, and then counsel father and the twins together during the second portion of the appointments. May said the twins had issues of dysregulation and challenging behavior, and they needed a caregiver who was consistently available, participated in counseling and speech therapy sessions, and followed the twins' individual education plans. However, the trial court found father missed 14 of the 30 appointments with the therapist, and he was significantly late for 12 appointments. His excuses were that he was conducting legal research, he could not obtain transportation, or he was not aware of the appointments. The court also found father expressed his belief that the speech delays would resolve on their own, and he was often unwilling to play with the twins.

{¶ 24} The trial court's concern with father's lack of commitment to therapy was supported by May's testimony. May testified that her goal was to build a stable and secure

attachment between father and the twins. She said there was stalled progress based on father's missed appointments, so developing a relationship with father was a challenge. May detailed father's missed appointments, as well as the appointments for which he was significantly late. He said he mostly missed therapy sessions and/or was late because he was conducting legal research or the bus was late.  May stated she tried to impress upon father how incredibly important it was for him to attend both parts of the sessions and be punctual. She explained that the first 25 minutes of the appointment was father's individual psychoeducation, and if he missed that portion of the session, they would not be clear about what goals they had for the second part of the session that involved interacting with the twins. She said although father had moments when he understood the twins' problems and needs, he expressed that he did not feel speech therapy was warranted and was not in agreement that the twins needed special education. Father was afraid the kids would be "labelled" if they had special education. May testified that in her entire career, she had never had any parent worry that special education would be considered a label. Parents typically beg for special education. May said father was very focused during the therapy sessions on his feelings of injustice with the court system and caseworker, and she had to redirect him back to the twins every session, making treatment difficult. She stated that father did not understand the trauma the twins experienced. May testified the twins needed a caregiver who was consistently available to understand their challenges, validate their history of trauma, and bring them to weekly counseling.

{¶ 25} The above testimony supports the trial court's concerns regarding father's therapy sessions and his ability to meet the basic needs of the twins. Although we agree the record shows that father was employed and maintained a home, May's testimony raises serious concerns about father's ability to be the full-time caregiver for the twins and provide them the proper intensive support they will need, both emotionally and educationally. Therefore, this factor weighs in favor of a grant of PCC.

{¶ 26} Although father claims he substantially complied with the case plan, we cannot agree. He established paternity, participated in a parenting class, and maintained a clean home, but May's and Dodson's testimony reveal serious concerns about the safety of father's home and his ability to meet the needs of the twins. These are two vitally

important portions of the case plan, especially his ability to meet the needs of the twins. May's testimony, in particular, severely undermines father's claim that he can effectively and constantly care for the twins, who have special emotional and educational needs. His lack of understanding the seriousness of their needs, coupled with his highly questionable excuses for completely missing or only partially attending the individual and joint therapy sessions with May, speaks volumes to this court. The twins need stable, safe, and comprehensive care, and father's past actions do not instill any confidence that he can provide such.

{¶ 27} Father also challenges the recommendation of the twins' GAL that PCC be granted. Father complains the GAL only attended one visit in four years, never asked the twins any questions about him, had not seen the twins in the seven months prior to trial, and said the twins wished to remain with the foster family despite the fact the twins appeared too young to coherently express their wishes to the trial court in the in camera interview. We find father's complaints unpersuasive. If father was unsatisfied with the GAL's investigation, he could have filed a motion requesting the GAL conduct additional investigations. Furthermore, father's counsel and father's GAL were free to explore this issue at trial but only asked a few questions in this regard. In addition, due to the twins tender age and developmental challenges, it was necessary for the GAL to express the twins wishes. The GAL testified he had discussed the proceedings with the twins and they indicated they wanted to stay with their foster parents. The GAL agreed and recommended that PCC be granted to FCCS. Although the twins were only minimally responsive to the questions regarding their wishes during the in camera interview, the GAL's expression of their wishes did not conflict with their responses during the in camera interview, and we can find no error in this respect. Therefore, for all of the foregoing reasons, father's sole assignment of error is overruled.

{¶ 28} Accordingly, father's sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

KLATT, P.J., and NELSON, J., concur.

_____